[Cite as *State v. Seaunier*, 2011-Ohio-658.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### UNION COUNTY

**STATE OF OHIO,**                                        CASE NO. 14-10-12

    **PLAINTIFF-APPELLEE,**

  **v.**

**JOSEPH SEAUNIER,**                                    **O P I N I O N**

    **DEFENDANT-APPELLANT.**

Appeal from Marysville Municipal Court
Trial Court No.  CRB 0901301

**Judgment Affirmed**

Date of Decision:   February 14, 2011

**APPEARANCES:**

    *Alison Boggs* **for Appellant**

    *Victoria Stone-Moledor* **for Appellee**

**SHAW, J.**

{¶1} Defendant-appellant, Joseph Seaunier ("Seaunier"), appeals the March 5, 2010, judgment of the Marysville Municipal Court, finding him guilty of one count of aggravated menacing in violation of R.C. 2903.21(A) and sentencing him to ninety days in jail.

{¶2} On November 20, 2009, officers with the Marysville Police Department responded to a call at a residence on East Fourth Street regarding a woman being threatened by a man with a knife. While en route, Officer Dennis Flanagan was advised that the man had discarded the knife but was now chasing a woman around a parked car. When officers arrived, they found Seaunier's sister, Brandi Greer, outside of the home. Greer, who was crying and upset, informed the officers that she had been attacked by Seaunier, who was now inside his home. Officers approached the home, and Seaunier came out onto the front porch. After speaking with some of the people on the scene, including Seaunier, who appeared to be under the influence of alcohol and/or drugs, the officers arrested Seaunier and removed him from the scene. Once Seaunier was removed from the scene, Greer stated that she now felt safe and the officers re-interviewed her as well as a number of other witnesses. Greer also provided a written statement to Off. Flanagan, reaffirming the verbal statement she had given him.

{¶3} Seaunier was subsequently charged with aggravated menacing, a misdemeanor of the first degree, in violation of R.C. 2903.21(A). He pled not guilty, and the matter proceeded to a trial to the court on March 5, 2010. Seaunier was found guilty of the offense, and the trial court sentenced him to ninety days in jail and ordered him to pay a fine of $600.00 and court costs. Seaunier was immediately taken into custody. Shortly after sentencing Seaunier, the trial court filed commitment papers for the Tri-County Regional Jail, where Seaunier was serving his sentence. Included in these commitment papers was a commitment for fines that notified the jail that Seaunier was ordered to pay a fine of $600.00 and that he was to be imprisoned in the jail immediately and to remain in the jail until he paid his fine or was otherwise legally discharged. This commitment paper also noted that Seaunier was to receive credit towards his fine at the rate of $50.00 for each day he was confined to the jail for not paying his fines. A notice was also filed that day by the clerk's office, which stated that Seaunier owed a total of $698.00 in his case, $600.00 of which was for his fine and $98.00 of which was for court costs. This notice further stated that court costs had to be paid first before any monies would be applied to the fine and that the payment of only the amount of fines would not terminate Seaunier's sentence to serve out fines in jail. In explaining this, the notice stated:

> **For example, where a Defendant owes fines of $600.00 and court costs of $210.00, and a $600.00 payment is made before Defendant has served out twenty-four hour days in jail, $210.00**

> **of the $600.00 payment would be applied to pay court costs and the remaining $390.00 would be applied to the $600.00 fine. A fine of $210.00 remains. Defendant would have to serve out the remaining $210.00 fine at $50.00 per day, i.e., serve an additional five, twenty-four hour days. (There is no credit for a partial day – a time less than twenty-four hours.)**

The return filed on Seaunier's commitment paper for his ninety-day sentence reflects that he was incarcerated at the jail from March 5, 2010, until May 15, 2010, seventy-one days, and that he received "work days credit"[1] for nineteen days for a total of ninety days. The return filed on Seaunier's commitment paper for his fines reflects that he was incarcerated at the jail from May 15, 2010, until May 27, 2010, a total of twelve days with a credit of $50.00 per day, for a total of $600.00.

{¶4} During his incarceration, Seaunier sent two letters to the court in March and April, respectively, requesting that he be released early. On May 7, 2010, an attorney from the Union County Public Defender's Office entered her appearance on behalf of Seaunier and subsequently filed a notice of appeal of Seaunier's conviction and a request to file a delayed appeal due to the trial court's failure to inform Seaunier at the time of his sentencing that he had a right to a direct appeal. This Court granted the request to file a delayed appeal, and Seaunier now asserts four assignments of error for our review.

---

[1] The record does not reflect that the trial court ordered work release or otherwise directed credit for work days. Further, the record does not otherwise indicate what the term "work days credit" means and whether these were days that Seaunier actually served in jail.

## ASSIGNMENT OF ERROR I

**THERE WAS INSUFFICIENT EVIDENCE FOR THE TRIAL COURT TO FIND DEFENDANT GUILTY OF AGGRAVATED MENACING.**

## ASSIGNMENT OF ERROR II

**THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

## ASSIGNMENT OF ERROR III

**THE TRIAL COURT ERRED WHEN IT FAILED TO ADVISE DEFENDANT OF HIS RIGHT TO APPEAL THE OUTCOME OF THE BENCH TRIAL AND REMAINING PROCEEDINGS AFTER HE WAS SENTENCED.**

## ASSIGNMENT OF ERROR IV

**THE TRIAL COURT'S POLICY OF INCREASING DEFENDANT'S JAIL SENTENCE THROUGH THE COMMITMENT PAPERWORK FOR THE NON-PAYMENT OF FINES VIOLATED DEFENDANT'S DUE PROCESS RIGHTS AND IS A VIOLATION OF OHIO REVISED CODE SECTION 2947.14.**

{¶5} This Court's analysis of the issues before it begins by noting that the appellee, the State of Ohio, failed to file an appellate brief in this matter. Appellate Rule 18(C) outlines the consequences of the failure of an appellee to file a brief:

> **If an appellee fails to file the appellee's brief within the time provided by this rule, or within the time as extended, * * * the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action.**

Case No. 14-10-12

We cannot overemphasize the importance of filing a brief on appeal and caution parties against this neglectful approach to appeals, especially when that party has an obligation to citizens of the State of Ohio. Despite the discretion afforded to this Court, we believe there are significant errors in the trial court's sentencing procedure that should be addressed by this Court, although Seaunier's brief has failed to convince us that reversible error occurred. Accordingly, we decline to apply App.R. 18(C) to this case, and we further decline to sustain these assignments of error for the reasons that follow.

*First and Second Assignments of Error*

{¶6} Seaunier asserts in his first assignment of error that the trial court erred in finding him guilty of aggravated menacing because the evidence was insufficient to support such a finding. In his second assignment of error, Seaunier maintains that his conviction was against the manifest weight of the evidence.

{¶7} Reviewing a challenge to the sufficiency of the evidence requires this Court to examine the evidence in the light most favorable to the prosecution. The Ohio Supreme Court has set forth the sufficiency of the evidence test as follows:

> **[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial and determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.**

-6-

*State v. Jenks* (1991), 61 Ohio St.3d 259, 273, 574 N.E.2d 492.

{¶8} Unlike our review of the sufficiency of the evidence, an appellate court's function when reviewing the weight of the evidence is to determine whether the greater amount of credible evidence supports the verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. In reviewing whether the trial court's judgment was against the weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Id.* In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Andrews*, 3rd Dist. No. 1-05-70, 2006-Ohio-3764, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *Thompkins*, 78 Ohio St.3d at 387.

{¶9} Here, the State had to prove that Seaunier knowingly caused another to believe that he would cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family. See R.C. 2903.21(A). Off. Flanagan testified that he was dispatched to 705 East Fourth Street, in Marysville, Ohio, on November 20, 2009, due to a report of a male subject threatening a woman with a knife. He was later

told that the male subject had discarded the knife but was now chasing a person around a parked car. When he arrived, he found Brandi Greer in a nearly hysterical state, and she informed him that Seaunier had attacked her. Off. Flanagan further testified that Greer did not become calm until Seaunier was taken into custody and removed from the scene. At that point, Greer stated that she felt safe and was able to provide a more complete statement to Off. Flanagan about what transpired between her and her brother.

{¶10} Greer was also called to testify on behalf of the State. During her testimony, she stated that she went to Seaunier's home that night because he had called and told her that he was going to kill himself. She further testified that when she walked into Seaunier's home, he was seated on the couch with a knife in his hand. She began screaming at him and crying, and he stood up and threatened to kill himself. Greer testified that she grabbed Seaunier's wrists and "yanked him" and that during this interaction, Seaunier's hand "smacked [her] up side [her] face[.]" (Trial Tr., 3/5/10, at p. 16.) Greer also testified that the only threat that Seaunier made was that he was going to kill himself and that she called 9-1-1 because she "was scared for his life." (id. at 17.) However, Greer also admitted that she told the officers who responded that night that Seaunier had "pulled a knife on [*her*]." (Emphasis added.) (id. at 18.)

{¶11} The State also introduced a recording of the 9-1-1 call that Greer placed that night. This recording reveals that Greer was clearly upset during much

of this call. She told the dispatcher that Seaunier had thrown her around, had thrown his girlfriend around, and was now chasing his girlfriend around a car. She also told the dispatcher that Seaunier had a butcher knife in his hand and had hit her in the face with it. At different times during this call, Greer can also be heard yelling at Seaunier, including yelling at him that he had hit her twice, had spit on her, and that she was going to press charges against him. Repeatedly, Greer told the dispatcher that Seaunier was going crazy. At one point, Greer informed the dispatcher that Seaunier said that he was going to kill himself, but she never stated that the only fear she had was that he was going to harm himself. To the contrary, the recording reflects that Greer was concerned for her safety and the safety of Seaunier's girlfriend because of Seaunier's behavior, including the fact that he was wielding a butcher knife, and that she was very anxious for officers to arrive, repeatedly telling the dispatcher that the officers were not coming quickly enough for her.

{¶12} After playing the recording, the State asked further questions of Greer regarding the 9-1-1 call. However, a portion of this examination is absent from the transcript because the recording equipment in the courtroom was turned off for an unknown amount of time and for unknown reasons.[2] Nevertheless, the

---

[2] The recording equipment appears to have been turned off when the prosecutor attempted to play the 9-1-1 recording. The transcript reveals that there were some problems with playing the 9-1-1 call and during this time the courtroom recording equipment was turned off. The transcript resumes during an objection by counsel for Seaunier and the response by the trial court, which clearly demonstrates that additional questions and responses occurred between the prosecutor and Greer prior to this time but that these were not recorded.

transcript includes additional testimony from Greer, wherein she identified Seaunier as the person with whom she had the altercation that prompted her to call 9-1-1 and that this occurred at his home in Marysville, Ohio.

{¶13} In light of all this evidence and construing it in a light most favorable to the prosecution, we find that there was sufficient evidence before the trial court to find that Seaunier knowingly caused another to believe that he would cause serious physical harm to the person. Further, we do not conclude that Seaunier's conviction was against the manifest weight of the evidence. Although Greer's testimony at trial was that the only concern she had was for her brother's life because he was threatening to kill himself and that he never threatened her that night, the testimony of Off. Flanagan and, more importantly, the 9-1-1 recording of Greer's call for police assistance on that night reflect that Greer was attacked by her brother and believed that he would cause serious physical harm to her when he came after her with a butcher knife. Moreover, even Greer's testimony at trial establishes that Seaunier knowingly caused her to believe that he would cause serious physical harm to a member of her family, namely himself, as he is her brother. For all of these reasons, the first and second assignments of error are overruled.

*Third Assignment of Error*

{¶14} In Seaunier's third assignment of error, he maintains that the trial court erred in failing to advise him of his right to appeal pursuant to Criminal Rule

32(B) and, as a result, his conviction should be reversed. Seaunier correctly asserts that the trial court did not advise him of his appellate rights. However, Crim.R. 32(B) only requires a trial court to advise a defendant of his right to appeal when the defendant is convicted of a serious offense. "Serious offense" is defined as "any felony, and any misdemeanor for which the penalty prescribed by law includes confinement for more than six months." Crim.R. 2(C). The offense of aggravated menacing as charged against Seaunier is a first degree misdemeanor for which the penalty prescribed by law does not include confinement for more than six months. See R.C. 2903.21(A); 2929.24(A)(1). Thus, the trial court was not required to inform him of his appellate rights. Furthermore, even if the trial court was required to inform him of his appellate rights, the remedy for such a failure is not necessarily a reversal of his conviction. Rather, Seaunier was permitted to file a delayed appeal in this matter and has been afforded every opportunity to present his assignments of error and arguments in support as if his appeal had been timely filed. Therefore, Seaunier has not suffered any harm due to a failure to be informed of his right to appeal. Accordingly, the third assignment of error is overruled.

*Fourth Assignment of Error*

{¶15} Seaunier asserts in his fourth assignment of error that the trial court erred when it issued commitment papers to the jail ordering Seaunier's confinement for the non-payment of fines without first affording him the due

-11-

process afforded him by R.C. 2947.14. Our review of this issue begins by noting that, in addition to other sanctions permitted by the Revised Code, R.C. 2929.28 allows a trial court to sentence a defendant who has been convicted of a first degree misdemeanor to pay a fine of not more than $1,000.00. R.C. 2929.28(A)(2)(a)(i). In addition, "[i]f a fine is imposed as a sentence or a part of a sentence, the court or magistrate that imposed the fine may order that the offender be committed to the jail . . . until the fine is paid[.]" R.C. 2947.14(A). However, before a trial court may order that an offender be committed to jail for the non-payment of fines, it must comply with all of the requirements of R.C. 2947.14.

{¶16} More specifically, the court must determine "that the offender is able, at that time, to pay the fine but refuses to do so." Id. In order to make this determination, the court is required to conduct a hearing at the time of sentencing.[3] Id. During this hearing, "the offender has the right to be represented by counsel and to testify and present evidence as to the offender's ability to pay the fine." R.C. 2947.14(B). Further, "[i]f a court or magistrate determines after considering the evidence presented by an offender, that the offender is able to pay a fine, the determination shall be supported by findings of fact set forth in *a judgment entry*

---

[3] The statute also contains a provision that permits a court to conduct an additional hearing at a later date in the event the court initially finds that the offender is able to pay but does not order the confinement of the offender and the offender later fails to pay the fine. In that case, the offender is entitled to a hearing "in order to inform the court or magistrate of any change of circumstances that has occurred since the time of sentencing and that affects the offender's ability to pay the fine." R.C. 2947.14(C). Although the offender may waive this right, if the offender does not do so, the same requirements of the initial hearing exist at the second hearing, including the right of the offender to present evidence and the mandate that a trial court issue a judgment entry that contains the findings of fact to support its determination that the offender has the ability to pay the fine. Id.

that indicate the offender's income, assets, and debts, as presented by the offender, and the offender's ability to pay." Id. (Emphasis added.)

{¶17} In the case sub judice, the trial court failed to follow any of these mandates before ordering Seaunier's commitment for the non-payment of fines. Instead, the trial court found Seaunier guilty and proceeded to sentencing, which included ordering him to pay a fine of $600.00. The judgment entry of the court, which is clearly a form entry, contains an "x" next to the following choice: "After trial the Court finds Defendant GUILTY and able to pay fines and costs[.]" However, there are no findings of fact to support the court's determination that Seaunier was able to pay, and, in fact, the record is completely devoid of any information regarding Seaunier's income, assets, debts, or ability to pay. Nothing regarding any of this information was discussed or even mentioned at the time of sentencing. Notably, the only information contained in the record regarding Seaunier's financial status at the time the trial court ordered his confinement for fines was an entry of appearance by the Union County Public Defender's Office on November 25, 2009, wherein that office noted that Seaunier was currently indigent pursuant to the laws of the State of Ohio and eligible for indigent representation. In addition to a lack of evidence as to Seaunier's ability to pay, the record is devoid of any evidence that Seaunier had the ability to pay his fine at that time *but refused to do so*.

{¶18} "It is axiomatic that '[i]n Ohio a court speaks through its journal.'" *State v. King*, 70 Ohio St.3d 158, 162, 1994-Ohio-412, 637 N.E.2d 903, quoting *State ex rel. Worcester v. Donnellon* (1990), 49 Ohio St.3d 117, 118, 551 N.E.2d 183.  Not only did the trial court fail to conduct the requisite hearing, to afford Seaunier the opportunity to present evidence regarding his ability to pay the fine, and to issue findings of fact that indicated Seaunier's income, assets, debts, and ability to pay, the trial court also failed to journalize its decision to confine Seaunier for his fines.  Rather, the trial court issued commitment papers to the jail to inform the jail officials that Seaunier was to remain in their custody until his fine of $600.00 was paid or otherwise legally discharged.  Further, the notification provided by the trial court to Seaunier, the prosecutor, the jail and "others concerning serving out of fines in jail" contained an explanation that any amount of money deposited on Seaunier's behalf would first be applied toward court costs and actually provided an example that, in essence, informed Seaunier that he would remain in jail until his fines *and court costs* were paid at a rate of credit of $50.00 for each day spent in jail.  Unfortunately, none of this was set forth in the actual judgment entry of sentence.

{¶19} More importantly, however, a court cannot incarcerate a person for non-payment of court costs, either directly or indirectly.  See *Strattman v. Studt* (1969), 20 Ohio St.2d 95, paragraphs six and seven of the syllabus, 253 N.E.2d 749 (holding that the obligation to pay court costs, in both civil and criminal

actions, is a civil obligation for which Art. 15, § I of the Ohio Constitution prohibits incarceration). Thus, to place a defendant in jail for the non-payment of fines and to keep him confined until such time as his fines were paid or he was otherwise legally discharged while simultaneously requiring that any monies deposited on the defendant's behalf be applied to court costs before being applied towards the fine is an unconstitutional deprivation of the offender's liberty to the extent that the offender is held for the total amount of court costs. Fortunately in this case, the returns on Seaunier's commitment papers do not reflect that he was held longer than twelve days: the number of days necessary to reach his total fine of $600.00 at a rate of $50.00 per day, which appears to indicate that he did not actually serve any time in jail for the non-payment of court costs. In short, the trial court erred in having Seaunier confined for the non-payment of fines without following the mandates of R.C. 2947.14.

{¶20} Nevertheless, despite these concerns, the record demonstrates that Seaunier has already completed his term of incarceration for the non-payment of fines. Thus, as applied to this case, the assignment of error is moot as there is no judgment to reverse and no remedy to otherwise provide in these proceedings. Accordingly, for this reason only, the fourth assignment of error is overruled, and the judgment of the Marysville Municipal Court is affirmed.

***Judgment Affirmed***

**PRESTON and WILLAMOWSKI, J.J., concur.**